May it please the Court, my name is Melissa Hedrick on behalf of the plaintiff appellant Lori Spellman. I realize we are here today on a 12 v 6 dismissal based on inadequate pleading under Rule 8, but I'm actually going to start my argument talking about preemption. I believe that no matter what I say about the adequacy of our complaint, which I know this court can read, defendant is going to advise this court that it doesn't matter because our device amendments or the MDA. Are you saying that you have a parallel pleading? I'm sorry, I couldn't hear you. Is it parallel, your claim? Yes, ma'am. Yes, ma'am. These claims have been brought against a medical device manufacturer, Smith & Nephew, on the Birmingham hip replacement, the BHR, which is actually the subject of an MDL in the District of Maryland. Do you concede that your claim is preempted to the extent that you're claiming that the design of this hip implant, even if it's manufactured according to spec, that the design is defective? I don't believe that if we have an allegation of design defect, we shouldn't have an allegation of design defect. Specifically, two claims, manufacturing defect. But we can forget about design defect. Yes, sir, absolutely. Oh, no design defect? No design. Manufacturing defect. I read the pleadings and I thought there was one. I'm sorry. I thought you had two. I thought it was a design or manufacturing defect. And a failure to warn. And a failure to warn. Did I miss a claim there? Manufacturing defect. Part of the issue, obviously, with federal regulations on manufacturing requirements is so that the device as manufactured comes out as the device that the FDA approved. That goes into quality control and whether or not they conducted adequate PMA studies to determine the durability of the device and whether or not there was adequate inspection to make sure that while the device was being manufactured, it was being manufactured according to the processes that the FDA approved. That's what I mean by a manufacturing defect. You're talking about pre-PMA activities? Well, as I understand the PMA process, in order to convince the FDA to allow you to market the device, a class three medical device, you have to convince the FDA of the safety and the efficacy of the device before the FDA will allow you to actually market it. And that generally includes telling the FDA how this device is designed, how it is manufactured, and what quality control steps the manufacturer intends to go through in order to assure the FDA that the device that comes out is the device that they approved. Have I got that all right? That's what I understand the PMA process to be. Correct. I think the defendant obviously advises the FDA of those processes, but the FDA itself actually imposes requirements upon the device that are part of the medical device amendments as well as part of the PMA approval that are specific to that device. I agree. But as I understand your claim, your claim is that notwithstanding all of that, something went wrong during the design and manufacturing. I thought there was a design defect. Our claim just doesn't perform as Smith and Nephew assured the FDA that it would. Isn't that your theory on that claim? Our claim is that based, so for example, two of our allegations were talking about the failure to properly determine the lifespan and failure to validate the anticipated wear of the ace tabular cuff. That's a design defect. Well, the way that courts have interpreted that was a manufacturing defect, and in fact, one of the cases in Smith and Nephew that we've cited in our briefs is Rob is I think there's a confusion of nomenclature here. There are various kinds of manufacturing defect. The specs are that it's going to be manufactured a particular way and it isn't. For example, it's supposed to be a smooth piece of metal and there's a small crack in it. Another kind of manufacturing defect is a defect in design. The thing is supposed to be able to bear 140 foot pounds of energy and it can only bear 100 pounds of energy because in the design it was curved wrong. It's manufactured according to spec and it breaks with 120 pounds of pressure on it when it's supposed to be good to 140 because the engineers designing it made a mistake. That kind of design defect is sometimes called the type of manufacturing defect. Sometimes it's distinguished. Are we on the same wavelength here? I think so, Judge. And I think you're claiming that it wasn't made according to spec rather than that the engineers didn't design it right, but I'm not sure that that's what you're saying. Correct. I hope we can provide an example that will clear the issue. This whole thing was recalled, right? Correct. For certain size cups. And it was recalled in particular for women. For women and for individuals under the age of 65. Yes, that's correct. And it was manufactured originally for people under 65. For younger people. For more active people, yes. Athletes that wanted before a full hip replacement to do this partial hip replacement. That's correct. And I hope my example can provide you some understanding of our claim a little bit better. And of course some of this information that I'm providing is the result of these claims being able to go forward despite motions to dismiss in other cases and particularly with the MDL. Is there a failure to warn case? It's not the usual state court tort where it's failure to warn the consumer. It's, in this case, failure to tell the FDA about problems that have arisen. Is that correct? To an extent. It's based on the Arizona failure to warn case, which ultimately can be a failure to warn the end user. But in Arizona, that state law is satisfied by warning third parties where there's a reasonable degree of certainty that that third party will provide that information to the person. I can't tell whether you're saying that my understanding of your claim was right or saying that my understanding of your claim was wrong, because there are a whole lot more words in your answer. I had thought that what you were saying was your failure to warn claim was not telling the FDA about problems that had arisen. You're telling me about Arizona law that says that's okay as a failure to warn claim, but you're not telling me that that's your claim. I think what I'm trying to do, because, of course, in the preemption issue under the MDA, we have to have a parallel state law claim. And so I was introducing, of course, the parallel state law claim, which is a failure to warn. Most failure to warn claims are, oh, don't mix the chlorine with iron. I can't remember what you're not supposed to mix the chlorine with, or it will produce a deadly gas. And that's supposed to be on the Clorox that you sell to consumers. There's another type of failure to warn claim that I think you're making here and that Arizona law says you can make, is you should have told the FDA about these reports you were getting from surgeons, and you didn't. Right. Correct. Is that right? Am I understanding what your claim is? Yes. Yes. Yes. So we do have the parallel state law duty of failure to warn that is satisfied by telling the FDA, which they did not do. So, yes, you're correct. Isn't it easier to prove, though, a manufacturing defect than a failure to warn? Is it easier to prove from a practical standpoint? I think it depends on the case. So you also say you've got a parallel claim for failure for a manufacturing defect. Correct. So I understand a manufacturing defect. You'll have to explain it to me, too, because I thought a manufacturing defect was if I want to manufacture water, I'm going to go to wherever and say I'm going to take two of these hydrogens and one of these oxygens and put them through here and it comes out water. And it turns out I instead did three hydrogens and one oxygen and it came out something else. That's a manufacturing defect. So what do you think they put in wrong that was not in the design that came out wrong? Okay. So, for example, what we have found based on Smith and Nephew's own studies of explanted devices, the device is supposed to have certain clearance tolerances so that it reduces the metal wear. Metal on metal? Correct. It doesn't get chromium and cobalt in your blood? Right. So what we're finding is on explanted devices, the clearance tolerances were not met. My understanding is, and of course, obviously there's going to be some expert testimony on this so I can provide my understanding of it, is they were supposed to be 100 microns, but instead were 271 microns. And this is based on Smith and Nephew's own studies on the explanted devices. And that difference is what has caused the increased metal wear. So that supports our manufacturing defect claim. During the manufacturing process, they didn't do the clearance tolerance aspect of it correctly. So your position that if we reverse the district court and say that you should be allowed to amend or that you, in fact, your petition is clear enough under the requirements to go forward, that you can go forward with a manufacturing defect and a failure to warrant and it will probably go to MDL. Is that right? And is it your understanding that the district court said it would be futile to allow you to amend? Yes. Which means that there's no possible factual basis to come up with a claim. Correct. Even though there are over 290-something of the same exact claims in MDL. That is correct. In fact, I downloaded five of the petitions that you cited, and a couple of them have the exact same wording as your petition. Is that right? That is correct. And I think that highlights one of the issues in our pleading, is obviously in some courts, the court says this is enough. For example, in the RAB case, the, you know, based on two of the allegations of the manufacturing defect, the court said, yes, these suggest an issue in the manufacturing defect, namely that there's problems with the ace tabular cup component. Read your petition and say that it doesn't have a cause of action. I'm sorry, what? It's hard to read your petition and say it doesn't have a cause of action, at least for me. I think that's our position, absolutely. I think that we agree. It was hard for me to read your petition at all, because the Xeroxing was faint. Whoever did it didn't have, they didn't put toner in the machine. Yeah. And the print was small, and I couldn't read the damn thing. We downloaded that directly. I honestly have no clear what happened in that electronic. Tell me, the problem that I had on my initial attempt to read it was the same one the district judge had. I saw this long list of regulations that a manufacturer of a medical device is supposed to follow, and perhaps because of my difficulty in reading, I was having trouble finding the part where you said, and they violated this regulation and the violation caused Ms. Bellman's injury. And maybe even as a bonus, this is how it caused her injury. I got my law clerk to read it, Younger Eyes, and I gathered there are some words in there. But tell me exactly what violation is supposed to have hurt her. How? Well, we, of course, we allege numerous violations. Look, you list a bunch of regulations. That's not the same as alleging violations. And then you can have a summary saying, and they violated a lot of them. But I still want to know, what did they do that was against the law that hurt Mrs. Bellman, and how did it hurt her? Well, so two things. With respect to our manufacturing defect claim, of course, and I know, obviously, that you read the complaint. Well, no, I just said I didn't. Well, I'm sorry. Because I physically was unable to. I'm sorry. I read the amended complaint that she wasn't allowed to file. That's the one I was trying to read. Oh. So, for example, we believe that our allegations that state that Smith and Nephew failed to properly determine the lifespan, failed to validate the anticipated wear of the ace tabular cup. We have some other issues. Let's say they did all those bad things. How did it hurt Spellman? Because the problem was, and I believe we allege this in our facts, was that her physician, you know, she had to have a revision surgery. And her revision surgeon advised her that the BHR with which she was implanted was defective, that it was causing her pain and the excess metal tissue or, I'm sorry, the reaction caused by the excess metal wear. So, by not doing those things that we alleged and I gave . . . Your link and what the district judge missed is that you're saying these violations caused her injury because they caused a defective device to be implanted in her that produced her injury. That is correct. And then, of course, with our failure to warn claim, the district court declined to accept our facts because we didn't provide any proof of those claims, which, of course, we're dealing with a device where much of that information is going to be kept confidential by . . . It comes to you, but it also is in the possession of Smith and Nephew. Correct. We obviously, as I said, based on discovery and cases that were allowed to go forward, as Your Honor pointed out, with sometimes even less facts or verbatim facts than we have . . . I'm having trouble with your of course. You can't keep . . . If a surgeon reports that a device failed, you can't keep that confidential. That's not a trade secret. You have to tell the FDA. That is part of our complaint, Judge. As far as the adverse event reporting, we do allege that Smith and Nephew withheld their required to advise the FDA of any adverse events. So that's your tie-in there? For the failure to warn, yes, sir. Did you allege in the complaint that had the FDA been informed, the surgeon would not have used the device? Yes. We allege that because of this, they weren't aware of the problems associated with the device. And I think that this Court's, at least the concurring opinion of Judge Watford in the Stengel decision, indicate that what Your Honor is talking about is certainly a proximate causation issue that we are going to be faced with down the road, that we are going to have to prove. Did you allege it? I believe we did, and I don't have that paragraph in front of me. Why don't you look it up while . . . Certainly. . . . while your opponent is arguing. Certainly. You've burned up all of your time. We've asked you a lot of questions. I'll give you some time on rebuttal. Good morning, Your Honors. May it please the Court, Mark Haddad, Sidley Austin for the appellee, Smith & Nephew, Inc. I'd like to offer two points to the Court this morning. Start with the manufacturing defect and the extent to which that's been pleaded here, and then I'd like to go to this question of proximate causation that Judge Kleinfeld asked about and the Watford concurrence and look at that a little more closely. But let's start with the manufacturing defect. I think as the Court's questions brought out so far, the key to a manufacturing defect claim in this medical device context is a claim that identifies a deviation from the specifications that FDA approved that occurred during the manufacture of the process. And so the first question the Court should ask as it looks at paragraph 20 of the proposed amended complaint, because that's the paragraph and it really didn't change between the complaint that was dismissed and the proposed amended complaint. They came back to the exact same allegations that the district court said were inadequate. And you'll find this at the ER at pages 59 to 60. If you look at what they allege, they have ten separate subparagraphs. None of them is a true manufacturing defect, something that is not an attack on either the design of the device or the procedures used to monitor the device once it's in production. So if you look at the first four of those ten subparagraphs, A through D, those are all design defect allegations. The one counsel has focused on in the reply briefing this morning is B, as in boy. And that not only is an allegation of a design defect on its face, but it cites to the design control regulation of the CFR. This is all what's done as part of the design, put in something called the DHF, or design history file, to document that the planning of the design has been done appropriately. The next two of the ten, these would be ENF, are simply conclusory allegations that there's a defect, but it doesn't tell you what the defect is. And then the last four are just general statements, conclusory statements about monitoring procedures. So they don't tell you what the manufacturing defect is. So when you look at what's in the complaint, and this is what the judge had before the judge at the proposed amended complaint, you don't see any description of a manufacturing defect that can survive after the Supreme Court's decision in the Regal v. Medtronic case. Regal v. Medtronic was on a motion to dismiss, and the Supreme Court made clear, if what you're alleging is a design defect, you cannot go forward. So regardless of whether these allegations are enough to state a claim of a design defect, they certainly aren't enough. If they have a design defect, I understand they've abandoned that. They have. So she's talking about manufacturing and failure to warrant. And the important point here is this complaint doesn't have a manufacturing defect. It has to have one under Rule 8. You've got to be able to read this and say, oh, I see the manufacturing defect. And it's not there. And it can't be an abuse of discretion in the district court. Why doesn't that just mean it should have been dismissal with leave to amend so that it looks like it might have been copied from something that's being passed around among plaintiff's lawyers? And Judge Jack has found out that it is indeed. But why couldn't the district judge just dismiss with leave to amend and tell her, say what the manufacturing defect is and how it hurts Spellman? And then she can do that if there's a complaint. So the district court did do that here, Your Honor. The district court dismissed the original complaint, said this is conclusory. I don't see the claims. But you can ñ I give you leave to propose an amendment. So the plaintiff filed a proposed amended complaint. And that's what I've been pointing the court to is the proposed amended complaint. Now, the plaintiff didn't change anything on the manufacturing defect, and that's what frustrated the district court. Again, I suppose if they're educated so that they understood what the problem was from just Xeroxing this national complaint. Well, they made other changes. And I'll talk about those and the failure to warn in a moment. But they didn't change the manufacturing defect. And I think that was what was so frustrating to the district court is I told you this wasn't good enough. You come back with the same thing. He said, I don't know whether you're unwilling to or you can't, but you're not stating what the manufacturing defect is. And so as the case comes to this court, you know, plaintiff wants to introduce new ideas, talk about a ñ Clarence Tolerance. Clarence Tolerance and so forth. But they could have told that to the district court. They didn't. It can't be an abuse of discretion for the district court not to consider a theory ñ Was this the aspect of the case where Judge Sedwick said, I'm frustrated here because I don't see any evidence of you going to any of these other courts that have entered protective orders and asked for permission to lift the protective order so that I can include more specification here? To be clear, Judge Holman, the district court didn't say that. They never mentioned to the district court that there were things that they thought they could say. The reality is they couldn't have said anything they said to this court they could have said to the district court. They just never said it to the district court. And your argument here is that I can look at this proposed amendment complaint at ER 59 and 60 and see that because there is no red line insert here, there was no change to these allegations. Exactly. They didn't make a change. They haven't pointed to anything new. They didn't tell the district court they needed access to any information. They didn't give the district court the opportunity to say, you know, well, let me help you or let's deal with the problem. They just came back with the same material after he gave them the chance to do something differently. Okay. Let's turn then to the failure to warrant a claim because I think that may be a tougher argument for you to make. I'm looking. There's a lot of additional red line here at ER 60, 61, 62, on to the top of 63. And as I understand their theory, their theory is Smith and Nephew were getting a substantial number of complaints from the field about problems, and they either were delaying forwarding those complaints on to the FDA or they were under-reporting the severity or the seriousness of the complaints. Now, why doesn't that sufficiently allege a plausible failure to warrant claim? And I guess the last part of what they're saying is had this information been relayed to the FDA in a more timely and more truthful fashion, my surgeon would have been and would not have used this particular device during the surgery. And the answer to your question, Judge Tallman, is what's missing is precisely that last clause of your question to me. So when the court goes and looks at paragraphs 22 and 32 of the complaint, those are the respective paragraphs that have the causation language in it, and it is purely conclusory. All it says is, as a direct result of the foregoing allegations, and thus and so. Now, the... Go ahead. I think we're... Go ahead. No, go ahead. You want me to articulate? Okay. If the allegation is they didn't timely report and they under-reported the severity of the complaints that were coming from other surgeons around the country who were experiencing problems with the device, and had that been done, my surgeon would have known sooner about problems with this device and would not have chosen this device. Isn't that sufficient to establish a failure to warrant claim? It isn't, Your Honor. This is a critically important question, so I'd really appreciate the opportunity to talk to the court about this. Sure. Sure. So if the court would go, for example, to the MAUD database, we cite this in footnote 12 of our brief, the court will see that FDA does not view these reports that get sent in as an independently sufficient basis to warn doctors about changing, you know, the warnings that FDA has already given. But I take it the medical community has access to the database. They do, and that's why the caution is there to make clear that, you know, these kinds of reports, these are reported constantly about every device, about every drug. Doctors consider them. They're in the FDA eventually may decide to put a warning on the box, and also the medical community. So many medical databases, secondary databases that are accessible to doctors on the net before they use a particular device. It's just like reading reviews. It's different, Your Honor, because you don't see the denominator. You see the numerator. So this report of this problem, that report of that problem, this complaint doesn't tell you what the problems are. But you don't see the denominator of the benefit, the uses that don't have a problem. Well, it's okay. The doctor makes a judgment. Well, they've been recalled. They weren't so great. Right? This is not a securities case where you need to set out everything in detail because it's under Rule 9. This is just a tort case under Rule 8. But, Your Honor, the reason I resist here is this. FDA looks at the whole cost-benefit, risk-benefit profile. It doesn't say we only let a device out that has zero risk. It lets out the devices where the benefits outweigh the risk. And it puts warnings that are considered warnings that reflect the risk. Now, let's look at what happened in Stengel. It's critical to distinguish the causation that was found adequate in Stengel from the lack of causation allegations here. And I would ask the Court, in particular, look at the cost-benefit. I don't think you understood my question. My question was, even if the FDA would not have put a black-box warning on the thing because of the number of complaints that would have been made had they not been suppressed, even so, wouldn't doctors be free to make their own decisions on risk and benefit based on the public knowledge that they would get of these warnings that had been given to the FDA? Yes, Your Honor. And there were warnings given. Yes. Exactly. So here, for example, it's within plaintiff's control to plead causation. She knows who her surgeon is. She could go to her surgeon. She could say, did you know that there were a certain number of complaints I've found that were belatedly submitted? Or, you know, whatever the allegation is. Where would she find those? Would that have changed those? Where would she find them? Well, she's alleged them in her complaint. Where would I find them if I were looking for something like that? You could go to the MAW database. When were the first warnings reported by your company to the FDA? There have been. . . First ones. I don't know the specific date on it, Your Honor, but there's been. . . I disagree. Communication with the FDA is extensive in order to get approval to begin with. So lots of studies have been submitted. Lots of things get approved. And lots of warnings have been submitted. Subsequently, doctors report various complications or problems that have arisen. And, of course, doctors' reports are published, right? But they take a long time to get published because they have to be peer reviewed. They have to submit articles. They have to have a big enough case study. And sometimes those take a very long time to reach the public. True. And even then they may reach the public before the FDA warnings reach the public. That's true. But if we have an individual doctor who would look at that, they could plead that. They didn't. But here's the critical distinction with Stengel. What do you mean? You mean the osteopath that first put him in? Yes. Yes. She could plead that this would have been material to her doctor. She didn't plead it, and neither did Stengel. But here's what Stengel pleaded for causation, that she did not. And this is what is so critical. And Stengel, at page 1227, this is Judge Fletcher's en banc opinion, explains that before Plaintiff was paralyzed, Medtronic had become aware of the risks but failed to inform the FDA. The FDA discovered the risks and discovered that Medtronic already knew about them when it inspected a Medtronic facility. And the FDA then sent a warning letter stating that Medtronic had been concealing known risks. And Medtronic then sent the warning to the doctors, albeit too late, to help this plaintiff. Now, that's the causation pleading that's totally missing here. There's also not the link to the individual doctor. Judge Watford writes a separate concurrence. A majority of the en banc panel joins it. And why does he do it? To explain that the causation allegation is sufficient here to let the case go forward. In the absence of that, he explains, you don't have a parallel claim that's not preempted by Buckman. Buckman, based on Section 337, says you cannot use state law to enforce failures to follow the FDA reporting requirements. So assume they've pleaded enough to say the company failed to follow the FDA reporting requirements. If they don't allege the causal piece, then it's a Buckman preempted claim. And so the court has to ask, do we have the causation we had in Stengel? We don't have it. Do we have the link to the individual physician as being the counter, you know, not the plausible physician who does what the FDA says don't do and reads the mod database for this? In the old-fashioned notice pleading, you certainly had notice of what the problem was when she filed a petition. But it's a two-step requirement in the Ninth Circuit. It's not just notice. It's has she pleaded a nonpreempted claim sufficient to start up the whole motion of litigation. And she refers to the MDL, but the MDL is at the pleading stage as well. So nothing special about the Ninth Circuit there. It sounds like you're trying to import Rule 9 specificity requirements for pleading fraud into Rule 8, and they don't apply. No, Your Honor. The reason it might feel that way is that Congress and the Supreme Court interpreting Congress in Regal and in Buckman have ruled out whole sections of, you know, claims that might otherwise go forward. That's not pleadings law. That's preemption law. But it applies at the preemption stage, as the Court did in Regal, as the Court did in Buckman. I don't understand. And since her doctor already says the reason this implant went sour is that the piece that I implanted was defective, it seems pretty likely that if she were allowed to amend, that same doctor would say, if I'd known about these reports, which were suppressed, I wouldn't have used the device. Two points on that, Your Honor. First of all, it's a different surgeon who does the second surgery. It's not the first surgeon. She has no allegation. Right. She could have asked that surgeon, would you do it differently? She didn't. There's nothing in the complaint on that. And the local doctor do it the first time, and then a Mayo Clinic doctor replaced him and said these were awful. The second doctor said it's defective, and Mayo Clinic, so we understand that. But it doesn't say whether it's a design defect or a manufacturing defect. He says it's a defect. Well, when there's metal in her blood, you know there's a problem. But you don't know whether it traces to the design of the device or to the manufacturer. If there's cobalt and chromium in your blood, it's going to come from the cobalt and chromium metal that's implanted in her, unless she's got some other cobalt, chromium floating around. But it doesn't tell you whether the device was not properly designed to prevent that. It's a metal-on-metal device. It doesn't tell you whether they used the wrong metal. If they used the wrong metal, that's a manufacturing problem. If they don't use the metal in the spec, but if they designed it with the wrong metal, then that's a design problem. Right, but she's got replaced, though. They used like a ceramic or another material for the acetabulum and metal for the femoral head. That's totally different than what this design was. Exactly. It's a different design. It doesn't shoot metal off of metal that way. Right. But if you're saying, boy, you should have never used metal-on-metal, well, that's the design FDA approved. And under the Supreme Court's regal decision, that's not available for State law claims. Okay. Thank you very much. Thank you. That's why she's sticking with the manufacturing. All right. Ms. Hedrick, I'll give you two minutes on rebuttal. First of all, in answer to the question of our pleadings, at paragraph 15 of our proposed First Amendment complaint, we do allege that at the time of the procedure, neither plaintiff nor her surgeon were aware of the myriad of problems associated with the BHR. Obviously, we meant that to be read in conjunction with our proximate causation. Additionally, with respect to the issues on causation that were addressed, you know, some of those issues addressed some of the issues that we had before the court, which were requesting letters from FDA. I know that we cited to cases in our briefs that said, you know, we don't have to have anything from the FDA saying that they weren't doing this. But we did, some of those warning letters that he was discussing at page ‑‑ I'm sorry, at paragraph 11, we did allege that they knew of these issues and they were not reporting. They knew of this wide swath of issues and were not reporting. Part of the requirement that was put upon us at the district court level was that we didn't identify specific unreported adverse events, but some of that has to come through discovery. As far as some of these allegations that I'm advising this court from the MDL, that MDL formed, I believe it was right after or right around the time that this decision was made. So we didn't necessarily have some of that information. Well, of course, the defense does because it's the defendant that asked the MDL panel to send these cases to an MDL judge. Correct. So they knew all about this and what was going on all around the country with this, and they also knew they'd been recalled. And was this case not included because it was so far along in terms of a dismissal order entered by the district court? Because the dismissal had been entered, I believe if it's remanded that it would go to the MDL, that would be my understanding. And there's a master complaint in the MDL that they would? That's much more robust. I will admit that. I will admit that. There has been discovery that has occurred, and there are many more allegations and much more facts that we do have now that is not protected any longer by Federal law. I would say based on the fact that this was a dismissal based on futility, that the district court was required to determine whether he could conceive of additional facts that might have saved our complaint. We certainly weren't being recalcitrant. Our complaint or even less robust facts had been allowed to go forward. These are difficult claims to plead because of the issue of protection by Federal law of a lot of the information that we need. We will admit that. And with respect to the issue of the adverse event reports, they say, well, it's not enough to recall the device. But we did cite to some cases, including a Supreme Court case at page 23 of our reply, and I know more cases in our opening brief, the Matrix Initiatives case, where they acknowledged that the adverse events may not provide certain proof of causation, but they can provide a prominent degree of suspicion. I think through discovery we would determine whether or not, as the court stated in Stengel, whether or not it would have reached her physician in time to have made a difference. Correct. How old is Ms. Feldman when this happened, when she got the first? I honestly don't recall. I don't recall. I know she was younger, but obviously, as you said, it was meant for younger individuals who are more active and that type of thing. Okay. Thank you very much. It was really interesting. Thank you, Bob. Thank you very much. Please disargue to submit. Thank you both for your excellent argument. And we are adjourned for the day.
judges: Kleinfeld, Tallman, Jack